UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LaMONICA McIVER. | Hon. Jamel K. Semper<br><br>Crim. No. 2:25-cr-00388-JKS |

**CONGRESSWOMAN McIVER'S REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON SELECTIVE ENFORCEMENT AND PROSECUTION, AND VINDICTIVE PROSECUTION**

September 25, 2025

ARNOLD & PORTER KAYE SCHOLER LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

On the Memorandum:

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
Samuel F. Callahan
Orion de Nevers
Amanda J. Raines

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1
ARGUMENT ................................................................................................................... 2
I.    There Is Clear Evidence of Selective Enforcement and Prosecution ..................................... 2
    A.    The Dismissed Assault Cases Against January 6 Defendants Establish Unconstitutionally Selective Action ................................................................................ 3
    B.    Public Statements and Other Actions of Executive Branch Officials Confirm that This Prosecution Is Unconstitutional ................................................................................ 7
II.    There Is Clear Evidence of Vindictive Prosecution ............................................................. 11
III.    At Minimum, Discovery Is Warranted ................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)......................................................................................................2

*Bordenkircher v. Hayes*,
   434 U.S. 357 (1978)....................................................................................................11

*Burdick v. U.S.*,
   236 U.S. 79 (1915)........................................................................................................4

*Frederick Douglass Found., Inc. v. D.C.*,
   82 F.4th 1122 (D.C. Cir. 2023)..................................................................................2, 6

*NAACP v. Button*,
   371 U.S. 415 (1963)......................................................................................................2

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021).........................................................................................7

*U.S. v. Esposito*,
   968 F.2d 300 (3d Cir. 1992).......................................................................................11

*U.S. v. Flynn*,
   507 F. Supp. 3d 116 (D.D.C. 2020) .............................................................................4

*U.S. v. Giusini*,
   No. CR 24-318 (BAH), 2025 WL 275683 (D.D.C. Jan. 23, 2025) ............................4

*U.S. v. Goodwin*,
   457 U.S. 368 (1982)....................................................................................................10

*U.S. v. Haggerty*,
   528 F. Supp. 1286 (D. Colo. 1981).............................................................................2

*U.S. v. Jones*,
   159 F.3d 969 (6th Cir. 1998) ...................................................................................8, 9

*U.S. v. Michel*,
   2022 WL 4182342 (D.D.C. Sept. 13, 2022) .............................................................11

*U.S. v. Smith*,
   231 F.3d 800 (11th Cir. 2000) .....................................................................................5

*U.S. v. Stanchich*,
    550 F.2d 1294 (2d Cir. 1977)...........................................................................................7

*U.S. v. Stone*,
    394 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................................5

*U.S. v. Torquato*,
    602 F.2d 564 (3d Cir. 1979)............................................................................................2

*U.S. v. Washington*,
    869 F.3d 193 (3d Cir. 2017)..........................................................................................11

*U.S. v. Young*,
    No. 23-CR-241 (GMH) 2024 WL 3030656 (D.D.C. June 17, 2024) .............................7

**Executive Branch Materials**

Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025) ..........................................................3

Dep't of Justice, Justice Manual § 9-85.110....................................................................10

**Other Authorities**

Ali Bianco, *Trump Defends His Pardons for Jan. 6 Attack on Capitol*, Politico
    (Jan. 21, 2025, 20:33 ET), https://www.politico.com/news/2025/01/21/trump-
    defends-pardons-jan-6-00199843 ..................................................................................7

Executive Grant of Clemency (Jan. 23, 2025),
    https://www.justice.gov/pardon/media/1390906/dl?inline.........................................4

*Memorandum on Addressing Risks from Chris Krebs and Government
    Censorship*, 2025 Daily Comp. Pres. Doc. 1 (Apr. 9, 2025),
    https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-
    from-chris-krebs-and-government-censorship................................................................7

Sadie Gurman & Lydia Wheeler, *James Comey Indicted on False Statement Charges*,
    Wall St. J. (Sept. 25, 2025), https://www.wsj.com/us-news/law/
    james-comey-indicted-on-false-statement-charges-
    2c896df2?st=gX4Tob&reflink=desktopwebshare_permalink.................................9

**INTRODUCTION**

The Constitution forbids criminal prosecutions based on policy views, political expression, or party affiliation. Executive Branch officials have nevertheless made numerous statements tying Congresswoman McIver's prosecution for assault to those constitutionally protected attributes—including several statements from the Department of Homeland Security ("DHS") that the government acknowledges were too inappropriate to publish but that reflect the government's actual views. Meanwhile, the government dropped cases against more than 160 defendants charged under the same statute for assaulting law enforcement officers during an attack on the U.S. Capitol aimed at overturning a presidential election. Several of those defendants violently attacked police officers with dangerous weapons; some caused severe injuries to officers; many showed no remorse for their actions; and some had serious criminal histories.

The government does not dispute that description. Nor does its brief make any effort to explain the palpable disparity between DOJ's treatment of Congresswoman McIver and the January 6 defendants. The government's reticence to go down that road is understandable. The dismissals of the cases against those individuals charged with violent, dangerous assaults strike at the heart of the federal government's purported "interest in vigorously prosecuting those who attack federal officers." Opp. 21 (internal quotation marks omitted).

Unwilling and unable to square the entirely different treatment, the government's primary response is that the January 6 assault defendants cannot be comparators *at all*, ostensibly for two reasons: (1) an unsupportable assertion that all January 6 defendants have been *pardoned*, and (2) an implicit argument that the conduct of those defendants was too violent, and the events of January 6 too unprecedented, to consider these defendants "similarly situated" to Congresswoman McIver.

That is a caricature of selective prosecution doctrine. A defendant need not identify an *identically* situated individual to establish an unconstitutional prosecution. Rather, the parties must

1

be "similarly situated"—that is, there must be a sufficient number of common factors from which to evaluate and draw conclusions of disparate treatment. That standard is amply met here. The government's own recounting of the facts confirms that the January 6 assault defendants presented far more compelling cases for prosecution on every plausibly relevant, permissible metric. Any doubts about the government's motive are dispelled by statements by public officials embracing the partisan, retaliatory nature of this prosecution. Those statements also suffice to establish vindictive prosecution, which requires no comparator evidence to succeed. Finally, at a minimum, Congresswoman McIver has identified far more than the "some evidence" required for *discovery*.

## ARGUMENT

**I.  There Is Clear Evidence of Selective Enforcement and Prosecution**

"Prosecutorial decisions, like other government actions, cannot turn on the exercise of free speech rights." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1141 (D.C. Cir. 2023); *see U.S. v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979) ("membership in a political party"); *U.S. v. Haggerty*, 528 F. Supp. 1286, 1292-93 (D. Colo. 1981) ("rights to free speech," "association," and "statutorily protected" rights); *see* Mem. 14-16. The government does not dispute these foundational principles.[1] Instead, the government simply contends that the 160-plus January 6

---

[1] The government resists *Frederick Douglass*, claiming that unconstitutional intent is required even for claims under the First Amendment. But *Frederick Douglass* being "a civil case" is not a meaningful distinction. The D.C. Circuit applied *criminal* selective prosecution precedents, explaining that "[s]electivity in the enforcement of criminal laws is … subject to constitutional constraints," and that "prosecutorial discretion … is not unfettered." *See id.* at 1137. Nor does the government identify any Third Circuit decision foreclosing the D.C. Circuit's approach, or any good reason why intent should be required in selective prosecution claims. The requirement of discriminatory intent in First Amendment claims was not presented in *Torquato*; it involved an "equal protection" claim, under which there is a required "element of intentional or purposeful discrimination," 602 F.2d at 568. The First Amendment is different: The "abridgment of … rights" to free speech and association violate the First Amendment "even though unintended." *NAACP v. Button*, 371 U.S. 415, 439 (1963); *see, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (finding First Amendment violation irrespective of intent). Regardless, there is ample evidence of unconstitutional intent here.

2

assault defendants whose cases have been dismissed do not provide Congresswoman McIver with a "proper comparator" who is "similarly situated." Opp. 14. The government's theories for ignoring the January 6 dismissals are untenable. And there is ample other evidence establishing selective prosecution and enforcement.

### A. The Dismissed Assault Cases Against January 6 Defendants Establish Unconstitutionally Selective Action

#### 1. The Theory That All January 6 Defendants Were "Pardoned" Is Both Wrong and Irrelevant

The government first claims that the January 6 defendants "all were pardoned" by President Trump in his January proclamation. Opp. 17. But the government provides no support for the key premise of that argument—that pardoned individuals *cannot* be comparators for purposes of a selective-prosecution motion. To be sure, the government observes that the President's pardon power typically cannot be "challenged or constrained." *Id.* at 15. And indeed, the President is free to exercise that power for political reasons. But his decision to do so still provides a meaningful— and, in this instance, dispositive—context in which to assess the DOJ's decision to prosecute someone else with a different political orientation for the identical crime on far less compelling facts. And the government cites nothing suggesting that merely evaluating the charged facts of a pardoned individual's case would "challenge" the President's authority. The government's extended discussion of the scope of the pardon power does not bear on Congresswoman McIver's motion.

Even so, the government's pardon theory requires rewriting the President's actual directive. The President's January 20 proclamation expressly distinguishes between (1) "full, complete and unconditional pardon[s]" for individuals "*convicted* of offenses" stemming from the January 6 attacks, and (2) a separate "direct[ion]" to "the Attorney General to *pursue dismissal* with prejudice to the government of all pending indictments." Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025)

3

(emphasis added).² As the government acknowledges, courts have since dismissed some of these cases in the second category *without prejudice*—contradicting the government's theory that the proclamation rendered any further prosecution impossible. Opp. 17 n.17 (citing *U.S. v. Giusini*, No. CR 24-318 (BAH), 2025 WL 275683, at *3 (D.D.C. Jan. 23, 2025)).

Moreover, as the government's own authorities make clear, "a presidential pardon generally must be *accepted* to be effective." *U.S. v. Flynn*, 507 F. Supp. 3d 116, 136 (D.D.C. 2020) (emphasis added) (citing *Burdick v. U.S.*, 236 U.S. 79, 94 (1915)). Thus, the most the government can possibly say is that January 6 defendants could be *eligible* for a pardon if they requested and accepted one. Yet the government acknowledges that, of the hundreds of January 6 defendants whose cases were pending, only *26* have requested certificates of pardon—and only two of the six defendants whom Congresswoman McIver cited as "exemplar cases" have done so. Opp. 7-8. In other words, even accepting the government's premise that all of these defendants could accept pardons, and that a pardoned individual cannot be a comparator, there are still at least a hundred January 6 defendants charged under § 111—including four egregious cases described in Congresswoman McIver's motion and again below—who have not accepted pardons and whose prosecutions have nonetheless been dropped by DOJ. In other words, numerous January 6 defendants are viable comparators even under the government's erroneous theory.

### 2. The Fact That the January 6 Defendants Acted More Violently Confirms Congresswoman McIver's Claim

Setting aside its erroneous pardon theory, the government cannot dispute that the January 6 defendants are "similarly situated" under the relevant standards. Most critically, the government

---

² The President has used different terminology in other pardons designed to cover un-convicted individuals—language making clear that the individual is being *pardoned* rather than subject to a mere direction that the case be dismissed. *See, e.g.*, Executive Grant of Clemency (Jan. 23, 2025), https://www.justice.gov/pardon/media/1390906/dl?inline.

4

does not dispute the *severity* of these defendants' actions, including that they "used weapons of various kinds against officers, caused serious injuries, and committed assaultive conduct for hours." Opp. 19. Even taking just the four "exemplar" defendants who did *not* request pardons, the charged facts are stunning. One defendant with a "lengthy and violent criminal history" was seen using "a metal bike rack to push against law enforcement officers and repeatedly spray[ed] them" with a "chemical spray." Another "assaulted multiple police officers for hours, at times deploying a baseball bat or a riot shield as a weapon and causing serious injury." Shortly after the attack, when asked what would happen next, the defendant told the interviewer, "Guns . . . That's it. One word." A third defendant was "forcibly pushing" multiple officers and "strik[ing]" one with a flagpole in the Capitol Rotunda. And a fourth defendant shot pepper spray at officers trying to prevent the rioters from surging up the Capitol steps. *See* Mem. 18.

The government does not try to minimize the gravity of this violent conduct. Rather, the government's theory seems to be that their actions were *too* severe to shed light on Congresswoman McIver's manifestly "different" behavior. Opp. 21. To that end, the government repeatedly asserts that the "relative severity" of the January 6 conduct is entirely irrelevant. *Id.* But that approach makes no sense, for it eliminates the single most salient factor for comparing two different cases. It also is not the law. Courts do not require that two parties be *identical* to evaluate a claim of selective prosecution. Rather, it must only be true that the "government's evidence against the comparator" was "*as strong or stronger* than that against the defendant." *U.S. v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) (emphasis added) (quoting *U.S. v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)). Additionally, courts consider other factors like relative "culpability" to ensure that the "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions." *Frederick Douglass*, 82 F.4th at 1137.

5

Applying these *actual* selective prosecution standards, the government identifies no legitimate basis for distinguishing Congresswoman McIver from the January 6 assault defendants. Instead, it cites four "obvious differences"—but each cuts sharply in Congresswoman McIver's favor. Opp. 20-21. For example, the "origin and impetus for the [charged] conduct" in this case (*id.* at 21) was Congresswoman McIver's authorized oversight visit; for the January 6 assault defendants, it was an unauthorized effort to disrupt Congress' certification of a presidential election that had gone against President Trump. For Congresswoman McIver, the "location of the conduct" (*id.*) was a federal facility at which she had statutory authority to be present, and the constitutional authority to inspect and observe ICE's conduct; the January 6 defendants forcibly attempted to and did enter the United States Capitol. And the limited "risks posed" by the Congresswoman's visit (*id.*) are borne out by the lack of any alleged injury to the federal officials at Delaney Hall. The January 6 defendants, by contrast, severely injured federal officers protecting the Capitol and the Members of Congress inside who were performing their constitutional responsibilities. Finally, the government cannot pretend that Congresswoman McIver was "better situated" to "de-escalate" (*id.*) a scrum initiated by ICE, than was a January 6 defendant who elected to pick up "a metal bike rack to push against law enforcement officers" to perpetrate an attack he started. Mot. in Supp. of Pretrial Detention at 1, 4, *Boughner*, No. 1:22-cr-00020-TSC (D.D.C. Dec. 19, 2021), ECF No. 9. And surely the "official duties being performed by the law enforcement officers" at the Capitol (Opp. 21) were more dangerous than those of the ICE officers at Delaney Hall.

The government also briefly flirts with the idea that January 6 defendants were not treated differently because of their "political affiliation" or their "particular views on the administration's immigration policy," but rather for some other unspecified reason. This Court need not "exhibit a naiveté from which ordinary citizens are free." *U.S. v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir.

1977) (Friendly, J.). It is beyond dispute that the attack on the Capitol was aimed to overturn the result of the 2020 presidential election. The Administration's official position is that this election "was rigged and stolen,"[3] and the President has described the now-former January 6 defendants as "people that actually love our country."[4] The January 6 cases were dismissed because the defendants in those cases supported the President's views, and the government's opposition does not seriously contend otherwise. Congresswoman McIver, by contrast, holds different views than the Executive Branch, expressed those views in statements and oversight actions, and represents the interests of the opposite political party.

Finally, the fact that some January 6 defendants *unsuccessfully* moved to dismiss their own charges based on selective prosecution does not help the government here. In the cases the government cites, courts denied relief precisely *because of* the extraordinarily violent and destructive nature of the January 6 attack—the "most significant assault on the Capitol since the War of 1812." *U.S. v. Young*, No. 23-CR-241 (GMH) 2024 WL 3030656, at *6 (D.D.C. June 17, 2024) (quoting *Trump v. Thompson*, 20 F.4th 10, 18-19 (D.C. Cir. 2021)); *see also, e.g.*, *id.* at *5 ("Members of Congress cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." (quotation omitted)).

### B. Public Statements and Other Actions of Executive Branch Officials Confirm that This Prosecution Is Unconstitutional

This comparator evidence does not stand alone. Numerous Executive Branch officials have made public statements reflecting that this prosecution rests on unconstitutional bases. *See, e.g.*, *U.S. v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998) (defendant "made the requisite showing of

---

[3] *Memorandum on Addressing Risks from Chris Krebs and Government Censorship*, 2025 Daily Comp. Pres. Doc. 1 (Apr. 9, 2025), https://www.whitehouse.gov/presidential-actions/2025/04/addressing-risks-from-chris-krebs-and-government-censorship.

[4] Ali Bianco, *Trump Defends His Pardons for Jan. 6 Attack on Capitol*, Politico (Jan. 21, 2025, 20:33 ET), https://www.politico.com/news/2025/01/21/trump-defends-pardons-jan-6-00199843.

discriminatory intent" where officers created t-shirts celebrating his arrest and sent him a racially stereotyped postcard); Mem. 22-24. Perhaps most concerning is the series of statements from DHS officials embracing a partisan and retaliatory view of Congresswoman McIver's conduct and prosecution. *Id.* at 22-23. The government recognizes their impropriety: It has "communicated with DHS to request that DHS remove the[se] postings." Opp. 78.

The government tries to downplay these statements by contending that Congresswoman McIver has no claim of selective *enforcement* (as opposed to prosecution), but only because the government takes an impermissibly narrow view of what counts as enforcement. The enforcement actions here were not limited to the (non-existent) *investigation*. Rather, they comprised a series of irresponsible, dangerous decisions to precipitate the chaos in the first place—including DHS's deployment of almost two dozen armed agents, who then surged into a crowd of civilians to arrest the Mayor of Newark for the baseless petty offense of trespassing on federal land. Mem. 10-12.

The government's minimization of DHS's role also cannot be squared with reality. On the day that the criminal complaint was filed against the Congresswoman, DHS Secretary Kristi Noem used social media to describe the "thorough review of the video footage of Delaney Hall and a full investigation from HSI" prior to the charges. In the same breath, she insisted that anyone who "assaults a law enforcement officer as we witnessed Congresswoman McIver do, you will be prosecuted to the fullest extent of the law."[5] These are not statements of a passive bystander. As for Mayor Baraka—the government concedes that the DHS agents made the arrest only "after consulting with the Deputy Attorney General." Opp. 3. Regardless, the government's artificial barrier between DHS and DOJ is legally unsupported: Statements of "law enforcement personnel"

---

[5] Secretary Kristi Noem (@Sec_Noem), X (May 19, 2025, at 20:05 ET), https://x.com/Sec_Noem/status/1924617499384930494?lang=en.

8

involved in a case can bear on the motives underlying a "selective *prosecution*," not just particular enforcement actions. *Jones*, 159 F.3d at 977 (emphasis added). The doctrine thus reflects common sense; law enforcement agencies have meaningful input in prosecutorial decision making.

The government's efforts to explain statements of the President and Justice Department officials fare no better. The President's declaration that the "days of woke are over" in connection with this prosecution is evidence that the charges are based on party and ideology and are part of a broader partisan agenda of ending "wokeness." The statement is consistent with the President's actions just last weekend when—concerned that "delay" in prosecuting specific political rivals is "killing our reputation and credibility"—he pushed out a "Woke RINO" U.S. Attorney who was inhibiting retributive prosecutions.[6] The President's statements may be inconvenient for the prosecution, but they accurately reflect his intent that the Department of Justice implement his political will. And the officials at DOJ have heard that call.[7]

The government makes an equally ineffective effort to characterize as mere "out-of-context sound bites" the then-Interim U.S. Attorney's highly politicized announcement on a podcast that her office was launching investigations of high-profile Democratic officials. Opp. 29. The problem is not merely the promise to use prosecutorial authority to help "turn New Jersey red." *Id.* Rather, the comment made an explicit connection between the Office's "law enforcement" priorities and "voting trend[s]" in favor of Republicans. *Id.* at 30. That is not a proper use of prosecutorial authority, and it corroborates that the Department is pursuing Congresswoman McIver's

---

[6] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 20, 2025, at 18:44 ET), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727; *see also* Alan Fuer et al., *Trump Demands That Bondi Move 'Now' to Prosecute Foes*, N.Y. Times (Sept. 20, 2025), https://www.nytimes.com/2025/09/20/us/politics/trump-justice-department-us-attorneys.html.

[7] Sadie Gurman & Lydia Wheeler, *James Comey Indicted on False Statement Charges*, Wall St. J. (Sept. 25, 2025), https://www.wsj.com/us-news/law/james-comey-indicted-on-false-statement-charges-2c896df2?st=gX4Tob&reflink=desktopwebshare_permalink.

prosecution because doing so could "benefit … Republicans." *Id.*

Finally, the government offers no satisfactory explanation for the procedural irregularities in this case. *See* Mem. 24-26. Acknowledging that the charging of Congresswoman McIver coincided with the dismissal of completely unsupportable charges against Mayor Baraka, the most the government can say is that the timing should "not come as a surprise." Opp. 28. Indeed, it was not a surprise because the timing gives rise to a strong inference that the Congresswoman's prosecution became a political imperative because DOJ needed to charge *some* Democratic official for the events at Delaney Hall. Ms. Habba's assorted *additional* statements that the government cites (at 28-29) do not dispel this inference.

Regarding the government's failure to consult with the Department's Public Integrity Section ("PIN"), the government claims that there has been no departure from ordinary procedures because, prior to charging Congresswoman McIver, the Department had "suspended" this consultation policy. Opp. 26. But the government provides no evidence of this supposed "suspension"; in fact, the Justice Manual still *mandates* PIN consultation "in all investigations involving a Member of Congress," and states that "approval *shall be obtained*" before prosecutions like this one that are related to public office.[8] Secretly abrogating this policy, if that has in fact happened, only *invites* and facilitates selective application. Regardless, the Department's wholesale dismantling of this consultation mechanism—designed to safeguard constitutional rights in prosecutions against Members of Congress—is no better than an individualized decision to ignore those procedures. Both reflect an intent to short-circuit procedures that could otherwise restrain improper, politicized prosecutions.

---

[8] Justice Manual § 9-85.110 (emphasis added); *see also About the Public Integrity Section*, U.S. Dep't of Justice (Aug. 11, 2023), https://www.justice.gov/criminal/criminal-pin/about.

10

## II. There Is Clear Evidence of Vindictive Prosecution

Dismissal is separately warranted because this prosecution is *vindictive—i.e.*, brought against Congresswoman McIver for "exercising a protected statutory or constitutional right." *U.S. v. Goodwin*, 457 U.S. 368, 372 (1982); *see* Mem. 26-28. Although the government's responses largely overlap with those it offers against the Congresswoman's claims of selective prosecution and enforcement, their brief misses one important distinction that renders much of its opposition irrelevant. Unlike claims of selective prosecution, claims of vindictive prosecution require no comparator evidence. *See, e.g.*, *Bordenkircher v. Hayes*, 434 U.S. 357 (1978). In other words, the viability of this motion does not turn on the treatment of any other target or defendant.

Here, the government cannot dispute that the sequence of public statements and policy changes regarding oversight visits following the events of May 9 and Congresswoman McIver's prosecution tell a story of retaliation against her for lawful legislative oversight activity—a story at least strong enough to give rise to the requisite "*reasonable likelihood* of a danger that the [government] might be retaliating against the accused for lawfully exercising a right." *U.S. v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992) (emphasis added). The government yet again tries to distance itself from DHS, which it insists "did not and never will control the prosecution of McIver." Opp. 42. But again, DHS *itself*—from its Secretary to its spokesperson to the HSI officers on the ground at Delaney Hall—does not share that view. *Supra* pp. 8-10. The government cannot continue to disclaim any connection between DHS's motive and the prosecution.

## III. At Minimum, Discovery Is Warranted

Because there is ample evidence to warrant dismissal of this selective and vindictive prosecution on the current record, there is necessarily more than "some evidence" of an unconstitutional prosecution that warrants discovery and a hearing. *U.S. v. Washington*, 869 F.3d 193, 220-21 (3d Cir. 2017). To that end, Congresswoman McIver complied with Court's direction

11

to provide the government with a plan and a proposal for such discovery.[9] The government, however, refused to respond substantively, insisting that *no* discovery is warranted. That position is unsustainable on this record. But the record is sufficient to warrant dismissal without discovery.

Dated: September 25, 2025

                                       ARNOLD & PORTER KAYE SCHOLER LLP

                                       By:  /s/ Paul J. Fishman
                                              Paul J. Fishman
                                              Lee M. Cortes, Jr.
                                              One Gateway Center | Suite 1025
                                              Newark, NJ 07102
                                              Telephone: 973-776-1901
                                              Paul.Fishman@arnoldporter.com
                                              Lee.Cortes@arnoldporter.com

                                         *Counsel for Congresswoman LaMonica McIver*

---

[9] The discovery requests include communications among all members of the prosecution team. *See* ECF No. 26-1. The Court should require the government to represent that all such communications have been preserved.

12

**CERTIFICATE OF SERVICE**

I certify that true and accurate copies of the foregoing document were sent by ECF service to all parties in this matter on September 25, 2025.

_____

Lee M. Cortes