UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| UNITED STATES OF AMERICA, | Hon. Jamel K. Semper |
|---|---|
| v. | |
| LaMONICA McIVER. | Crim. No. 2:25-cr-00388-JKS |

**CONGRESSWOMAN McIVER'S REPLY IN SUPPORT OF MOTION TO COMPEL DISCOVERY**

September 25, 2025

A<small>RNOLD</small> & P<small>ORTER</small> K<small>AYE</small> S<small>CHOLER</small> LLP
One Gateway Center
Suite 1025
Newark, NJ 07102

*Counsel for Congresswoman LaMonica McIver*

On the Memorandum:

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
Samuel F. Callahan
Orion de Nevers
Amanda J. Raines

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii
INTRODUCTION ................................................................................................................... 0
ARGUMENT ........................................................................................................................... 0
    I.    Congresswoman McIver's Discovery Requests Are Not Moot ................................. 0
    II.    The Government is Mistaken About Missing BWC Footage ..................................... 2
    III.    Congresswoman McIver is Entitled To Agents' Communications ............................ 4
    IV.    The Government is Not Complying with its *Brady* Obligations ............................... 7
    V.    The Government Has Not Addressed the Missing Surveillance Footage ................... 9
    VI.    Congresswoman McIver is Entitled to Internal DHS and ICE Policies ..................... 9

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................................ 1

*Glass v. City of Philadelphia*, 455 F. Supp. 2d 302 (E.D. Pa. 2006) ......................................... 7

*United States v. Baker*, 658 F.3d 1050 (9th Cir. 2011) ............................................................. 7

*United States v. Brown*, No. CIV.A.04-4121, 2006 WL 3000960 (E.D. Pa. Oct. 18, 2006) ...... 7

*United States v. Goodwin*, 440 F.2d 1152 (3d Cir. 1971) ......................................................... 6

*United States v. Papagni*, Crim. No. 18-336 (D.N.J. Jan. 30, 2019) ........................................ 5

*United States v. Ramirez*, 233 F.3d 318 (5th Cir. 2000) ........................................................... 5

*United States v. Suarez*, Crim. No. 09-932, 2010 WL 4226524 (D.N.J. Oct. 21, 2010) ............ 9

*United States v. Vaughn*, Crim. No. 14-23, 2015 WL 6948577 (D.N.J. Nov. 10, 2015) ............ 9

*United States v. Walker*, 155 F.3d 180 (3d Cir. 1998) ............................................................ 10

**Statutes**

Approps. Act § 527 ................................................................................................................ 11

**Other Authorities**

Eleventh Circuit Pattern Jury Instructions (Apr. 15, 2024) ........................................................ 6

U.S. Dep't of Justice, *Justice Manual*, § 9-5.001 ..................................................................... 9

**Rules**

Fed. R. of Crim. P. 16 .............................................................................................................. 1

**INTRODUCTION**

Congresswoman McIver has moved for an Order directing the government to supply discrete categories of materials pursuant to its obligations under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963). The government resists, claiming that the Congresswoman's requests are (1) moot; (2) seek materials that do not exist; or (3) go beyond Rule 16. Mem in Opp. ("Opp.") 69, ECF No. 27. Those objections are factually incorrect, and wrong as a matter of law. The Court should order the government to provide the relevant materials.

**ARGUMENT**

**I.       Congresswoman McIver's Discovery Requests Are Not Moot**

First, the government asserts that some of the Congresswoman's requests are "moot because the Government has agreed to provide her with what she seeks." Opp. 69. In particular, the government has agreed to produce the video recordings from inside Delaney Hall that related to the Congresswoman's tour of that facility on May 9. ECF No. 19-15 (Cortes Decl. Ex. M). But it is now more than six weeks since the government made that promise, and the defense has not received that material.

The government offers no real excuse: it merely claims that "ICE is currently reviewing the footage . . . to excise hours of video during the relevant timeframe which does not capture the Congressional tour." Opp. 70. Yet the government provides no explanation why that process has taken so long. In fact, the Congresswoman and her colleagues were inside the facility from approximately 2:48 p.m., after Mayor Baraka was arrested, until 3:47 p.m., when the Members left Delaney Hall; surely agents are capable of reviewing those recordings from that one-hour timespan and sorting out the portions capturing the visit.

Nor does the government explain the necessity to "excise" scenes that do not relate to the Congresswoman's tour. Certainly, the government identifies no privilege or security issue that

would warrant or require such a process. Indeed, because the Congresswoman is a Member of the House of Representatives, as well as a member of that chamber's Homeland Security Committee, there is no conceivable reason to keep her from seeing all of that footage.[1] The Court should order its production immediately.

The government also promised in its August 11 letter to produce the identities and ranks of any officers and agents present "at the time of the arrest of Mayor Baraka," as well as identify which of those individuals were equipped with a body worn camera ("BWC"). Cortes Decl. Ex. M. To be sure, the letter also conditioned the information's release on the parties' execution of a protective order. Six weeks later, however, there is still no draft. The government merely promises that "this should be accomplished by the end of September," with no explanation for the delay. Opp. 72.[2] The Court should order the government to provide Congresswoman McIver with a proposed protective order immediately. And the Court should also order the government to prepare the production in the meantime.

Finally, the August 11 letter confirmed that the government would produce maps, diagrams, or plans of the Delaney Hall facility. *See* Cortes Decl. Ex. M at 2. In subsequent phone calls, the government further agreed to consider providing the defense with the opportunity to inspect Delaney Hall. Once again, Congresswoman McIver has received none of those documents, and

---

[1] The government also claims that all of the interior footage, even the portions depicting the Congresswoman's tour, is beyond the reach of Rule 16. *See* Opp. 70. Because the government has agreed to provide the footage, the Court need not address that unsubstantiated and erroneous claim.

[2] In addition, the government agreed in its August 11 letter to provide any video footage from May 9 that was recorded by dashboard cameras in the law enforcement vehicles at the scene. *See* Cortes Decl. Ex. M at 2. The government now explains that "the relevant vehicles were not equipped with video cameras that captured video footage of the events in question. Thus, there is no such video material to produce in discovery." Opp. 72. However, the brief does not clarify whether the dashboard cameras captured footage on May 9 at all, and whether the agents simply deemed the recordings not relevant because they did not capture "the events in question."

1

there has been no information forthcoming about an inspection. The Court should order the Government to provide a timely response.

## II. The Government is Mistaken About Missing BWC Footage

The government now confirms that there were sixteen ICE and DHS personnel present at Delaney Hall on May 9 who were "eligible" to wear BWCs, but states that only eleven of them were so equipped. The government proffers that those eleven had received the required training in the proper use of the equipment, but that four others—including the officer described in Count 2 of the Indictment as Victim 2—had not yet been trained. The brief also purports to explain that one other officer—who apparently *had* been trained—failed to bring his BWC to the scene. Accordingly, although the government has produced BWC footage from only eleven officers present on May 9, the government asserts that "all BWC footage captured on May 9, 2025, has been provided in discovery, and no officer ignored applicable regulations by failing to activate his or her BWC on that date." Opp. 71–72.

The discovery reveals that the government's explanation is inadequate and may be inaccurate. For example, the videos produced by the government indicate that there was at least one ICE officer who was present on May 9 and was carrying an Axon Brand BWC but for whom there appears to be no corresponding recording. *See* Cortes Decl. Ex. W at 00:57; *see also* Cortes Decl. ¶¶ 4–6. That would make at least *twelve* officers on the scene who had such equipment.[3]

In addition, the government offers absolutely no evidentiary support for any of the factual assertions in its Opposition. For example, the government simply declares that, in "May of 2025,

---

[3] There is another ICE officer whose image (*see* Cortes Decl. ¶ 6) on one of the videos (*see* Cortes Decl. Ex. B) suggests that he may also have been equipped with a BWC. And once again, there are no corresponding recordings in the discovery materials.

2

ICE New Jersey was in the process of distributing BWCs to certain personnel as part of a pilot program undertaken by ICE nationwide." Opp. 71.[4] But the government attaches no documents that describe any pilot program; no list of which officers had been trained; no list of which officers on scene were equipped with BWCs; and no explanation about the circumstances surrounding the one officer's failure to bring his BWC to Delaney Hall.

Moreover, even if ICE was actually implementing a new "pilot program," the government offers no information about that program; why ICE supervisors elected to deploy agents who were not equipped with or trained to use BWCs in this significant law enforcement operation; why one of the officers who *had* "received that training did not have his BWC with him when he arrived at Delaney Hall"; and why and how his supervisors permitted that violation of policy.

At the very least, the Court should require the government to answer those questions, as well as to produce: 1) all documents related to the "pilot program"; 2) the training records applicable to those who were present at Delaney Hall on May 9; and 3) documents related to the assignment of officers to law enforcement operations who have not been trained in the use of BWCs, and their responsibilities during those operations. Given the prominence that the government assigns to these videos as the major evidence in its case, Congresswoman McIver

---

[4] This claim seems inconsistent with ICE's announcement in December 2021 that it had begun a pilot program for deployment of BWCs for HSI officers in Newark and its January 2024 announcement that it was updating agency-wide policies for BWC use. Press Release, U.S. Immigr. and Customs Enf't, *ICE Announces Use of Body Worn Camera in New Pilot Program* (Dec. 21, 2021), https://www.ice.gov/news/releases/ice-announces-use-body-worn-camera-new-pilot-program; Press Release, *U.S. Immigr. and Customs Enf't, ICE Announces Updated Policy for Body-Worn Cameras* (Jan. 12, 2024) ("Examples of activities covered by the policy include at-large arrests . . . deploying to protect Federal Government facilities; responding to public, unlawful/violent disturbances at ICE facilities; and interactions with members of the public while conducting the above-listed activities in the field; and when responding to emergencies."), https://www.ice.gov/news/releases/ice-announces-updated-policy-body-worn-cameras.

3

should have full information about the policies pursuant to which they were created, why they were activated when they were, and why they were shut off when they were. This information is particularly important because there are three officers—the individual whom the indictment identifies as Victim-2; the officer who appeared to forcibly shove Congresswoman McIver (*see supra* note 3); and yet a third who yanked her violently—from whom there are no corresponding recordings at all.

### III.    Congresswoman McIver is Entitled To Agents' Communications

Relying on Rule 16 and *Brady*, Congresswoman McIver has moved for the production of all communications that indicate or show a lack of fear, harm, or intimidation on the part of officers and agents who were present on May 9. The government opposes that request, claiming that such perceptions or experience are not elements of the offense and are not material to Congresswoman McIver's defense. Opp. 72–73. That argument is both incorrect as a matter of law and takes an unfair and inappropriate approach to the government's Rule 16 and *Brady* obligations.

*First*, relying on one 25-year-old case from the Fifth Circuit, the government asserts that "fear" is not an element of 18 U.S.C. § 111(a). Opp. 73 (citing *United States v. Ramirez*, 233 F.3d 318, 321 (5th Cir. 2000)). But that assertion ignores precedent to the contrary from this Court. Indeed, in *United States v. Papagni*, Crim. No. 18-336, Dkt. 94, at 19 (D.N.J. Jan. 30, 2019), Judge Hayden held that "assault" means "an unlawful attempt or threat to do injury to the person of another, when coupled with the apparent present ability to do so sufficient to put the person against whom the attempt or threat is made in fear of immediate bodily harm."

*Second*, the Indictment charges that Congresswoman McIver "did [forcibly] assault, resist, oppose, impede, *intimidate*, and interfere" with federal officers. (Emphasis added). As the Court instructed the jury in *Papagni*, "intimidate" means to "make [the officers] timid or fearful, to inspire or affect with fear, to frighten, to deter, or overawe." *Papagni* Jury Instructions at 20. That

4

instruction was consistent with the Third Circuit's decision in *United States v. Goodwin*, 440 F.2d 1152 (3d Cir. 1971), in which the court found that a charge of "forcible intimidation" was supported by evidence that the defendant had "placed the agents in fear of danger." *Id*. at 1154; *see also* Eleventh Circuit Pattern Jury Instructions (Apr. 15, 2024) ("A 'forcible assault' is an intentional threat or attempt to cause *serious bodily injury* when the ability to do so is apparent and immediate. It includes any intentional display of force that would cause a reasonable person to expect *immediate and serious bodily harm or death*.") (emphasis added). In other words, the government is incorrect when it asserts that "the focus is on the actions and intent of the accused." Opp. 74. To the contrary, the experiences of the agents and officers on May 9 are material to this case, and the defense is entitled to full discovery concerning them.

*Third*, had any of the alleged victims been even slightly injured or afraid in any way, the government surely would have included that allegation in the Indictment. Moreover, if any of those agents had been injured, the government might well try to put that information before the jury. By the same token, the *lack* of fear, injury, or even noticeable contact all tend to negate the allegations that the Congresswoman "forcibly" put agents in fear of physical harm. Moreover, Congresswoman McIver is entitled to full information about the experience of her alleged victims. Whether or not fear is an element of every one of the six "actions" with which she is charged, the Congresswoman would be entitled to explore on cross-examination the agents' experience of and reactions to their interactions with her on the scene.[5]

---

[5] And, of course, the lack of harm and fear on behalf of any agents or officers is clearly relevant to the Congresswoman's motions to dismiss for selective and vindictive prosecution, because it distinguishes her conduct from that of January 6 defendants whose cases were dismissed.

Although the Court will ultimately decide whether to follow *Papagni*, the proper scope of discovery does not turn on the precise jury instructions that the Court will ultimately give. Indeed, it would be manifestly unfair for the government to skirt its discovery obligations while it waits for the matter to be resolved by the Court's jury instructions.

All videos documenting Congresswoman McIver's visit to Delaney Hall—from beginning to end—and all communications concerning that visit should be provided to the defense. That is commonplace in cases when the interactions between a defendant and law enforcement are central to the case. *See, e.g.*, *United States v. Brown*, No. CIV.A.04-4121, 2006 WL 3000960, at *2 (E.D. Pa. Oct. 18, 2006) (police radio transmissions used at trial); *Glass v. City of Philadelphia*, 455 F. Supp. 2d 302, 322 (E.D. Pa. 2006) (police radio transmissions admitted at trial). It is particularly appropriate here because those videos and communications likely contain evidence of ICE's strategy to obstruct the Members' legislative oversight of Delaney Hall, which included the baseless arrest of Mayor Baraka. *See also United States v. Baker*, 658 F.3d 1050, 1052 (9th Cir. 2011) (defendant successfully used contradictory information communicated over contemporaneous police dispatch, resulting in an acquittal of felony drug counts), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012).

It is apparent from the BWC that officers and agents present on May 9 communicated via mobile phone in real-time with their supervisors, and likely with each other, about the mobilization and the events of the day. For example, at around 1:30 pm on May 9, one ICE officer held his cell phone in front of his BWC while messaging a group text chain about the reason for the Members' visit to Delany Hall. *See* ECF No. 19-4 (Cortes Decl. Ex. B) at 06:27. Those communications about the events at Delaney Hall are analogous to radio transmissions to the extent that they provide

6

contemporaneous statements by law enforcement about the events, and are discoverable for the same reason.

The contemporaneous messages are separately material to Congresswoman McIver's defense because there is not otherwise a cohesive record of the agents' and officers' thoughts and impressions about the activities occurring on May 9. The BWC recordings are incomplete, not only because recordings are missing, or shortened, but because they were turned on and off as the officers saw fit throughout the day. Indeed, the officers were recorded at various points telling each other to turn the cameras off. Congresswoman McIver is entitled to the contemporaneous messages.

Given the prosecution's overly narrow view of evidence that might fall within the ambit of Brady and Rule 16, the Court should direct the government to collect and produce all of those contemporaneous communications to the defense immediately. That is the only way to ensure that Congresswoman McIver has the opportunity for a fair trial.

## IV. The Government is Not Complying with its *Brady* Obligations

The government makes crystal clear that the prosecution is not fulfilling its constitutional responsibilities to provide the defense with information that is or might be exculpatory:

> [T]he officers involved have been directed to retain their communications relating to their actions on May 9, 2025 at Delaney Hall. The Government is aware of its *Brady* obligations and will turn over any communications that could be reasonably deemed exculpatory.

Opp. 74. There are several obvious problems with that description.

*First*, although the officers have been "directed" to preserve that material, it is unclear who actually gave that direction or how they communicated it. Nor is there any information about the scope of the preservation. For example, were the officers instructed to retain all of their communications, whether on personal or government-issued devices? Were they told that they had to preserve all transmissions on *every* medium and application, including those on which messages

7

disappear such as Signal, Telegram, and WhatsApp? Were they informed that the scope was to include any electronic or written communications with anyone, regardless of the recipients' or senders' relationship to the government?

*Second*, it is not clear from the government's use of the passive voice whether the Assistant U.S. Attorneys ("AUSAs") have had any interactions themselves with the officers. More important, it does not appear that the AUSAs have confirmed with any—much less all—of the officers that they have complied with the direction.

*Finally*, and most concerning, it is quite clear from the government's formulation that the government has not actually collected, much less reviewed, those communications themselves. Without having done so, the prosecution team has not fulfilled its *Brady* obligations and cannot credibly represent otherwise to the Court or defense. That is because they *do not know* what is contained in the communications. Notably, the still-applicable *Justice Manual* provision on criminal discovery provides that it is the government's obligation "*to seek* all exculpatory and impeachment information from all the members of the prosecution team," including all federal law enforcement officers and attorneys "participating in the investigation and prosecution of the criminal case against the defendant." U.S. Dep't of Justice, *Justice Manual*, § 9-5.001(B)(2) (emphasis added). That clearly has not happened here. That review cannot and should not wait to some later time, further risking that the communications will have been erased or otherwise compromised, and depriving the defense of them forever. *United States v. Vaughn*, Crim. No. 14-23, 2015 WL 6948577, at *19-20 (D.N.J. Nov. 10, 2015) (granting motion for sanctions against prosecution for failing to preserve and collect law enforcement text messages); *United States v. Suarez*, Crim. No. 09-932, 2010 WL 4226524, at *6-7 (D.N.J. Oct. 21, 2010) (same).

## V. The Government Has Not Addressed the Missing Surveillance Footage

Congresswoman McIver previously requested expanded surveillance footage, showing more angles of the Delaney Hall parking lot, as well as video footage for the entire duration that the Members were present. The government has not even addressed this request in their Opposition. For the reasons stated in Congresswoman McIver's Motion to Compel, see ECF No. 22-1, the footage is material to the defense and the Court should order the government to produce all surveillance videos from Delaney Hall.

## VI. Congresswoman McIver is Entitled to Internal DHS and ICE Policies

Congresswoman McIver has moved for the production of a various policies, manuals, and training materials of DHS, ICE, HSI and any other federal agency involved in the events at Delaney Hall on May 9, 2025. Opp. 74. The government objects:

> [I]f law enforcement failed to adhere to policies and or guidelines set forth in DHS, ICE or HSI manuals, that offers no defense to the charges brought against Defendant. Simply put, Defendant was not entitled to assault, interfere with or impede law enforcement officers in the performance of their official duties even if their actions ran counter to written policies especially given that she was not the subject of the arrest.

Opp. 75. Once again, the government takes an overly restrictive approach to material to which a defendant is entitled.

First, as the government is undoubtedly aware, it is entirely proper as a general matter for a defendant in a criminal trial to confront any law enforcement witnesses and challenge their credibility with evidence that they have failed to conduct themselves appropriately. *See, e.g.*, *United States v. Walker*, 155 F.3d 180, 185-187 (3d Cir. 1998) (in a case discussing a different issue, the Third Circuit discusses several cases where the credibility and actions of government law enforcement witnesses were put directly at issue in criminal trials).

Second, the government has already conceded that policies were not followed. The most egregious example is that the entire operation on May 9 was apparently undertaken in a way that

would interfere with the statutory and constitutional obligations of three Members of Congress to exercise their oversight responsibilities. In taking these actions, the relevant federal agencies all ran afoul of the statutory provision that no DHS resources be used to keep Members of Congress from conducting inspections of ICE detention facilities. *See* Approps. Act § 527.[6] The underlying policies and manuals setting out how ICE should respond to Congressional oversight visits are clearly material and relevant to Congresswoman McIver's defense, as are all internal communications regarding oversight visits in general and the one that took place on May 9. The prosecution cannot unilaterally declare them off limits because it would prefer to focus only on two or three minutes of the events that transpired on May 9.

Third, while the government opines that the scope of these requests is "breathtaking," the hyperbole is obvious. In fact, Congresswoman McIver is seeking manuals, guidelines, and policies related to a discrete set of issues that are clearly germane to the officers' conduct on that day:

1. crowd control and/or de-escalations;
2. effectuating arrests, including but not limited to occasions when members of the public or other individuals may be present;
3. safety considerations and use of force in law enforcement operations;
4. deployment of vehicles for crowd control, safety, or arrests; and
5. visits to or inspections of ICE detention or other facilities by members of Congress."

ECF No. 22 at 12; *see also* ECF No. 19-13 (Cortes Decl. Ex. K) at 5.

Here, it does not appear that the government has inquired about the volume of the responsive materials or how difficult it would be to gather them. And it is hardly likely that they are so massive that it will be much of a burden for the government to gather and produce them. The Court should direct them to do so.

---

[6] The government also concedes that one officer somehow failed to bring his BWC to the scene and the video evidence produced by the government shows that agents chose to wade into a crowd of civilians to arrest the Mayor of Newark for trespassing.

Dated: September 25, 2025

                                                                             ARNOLD & PORTER KAYE SCHOLER LLP

By: _____
                                                                    Paul J. Fishman
                                                                    Lee M. Cortes, Jr.
                                                                    One Gateway Center | Suite 1025
                                                                    Newark, NJ 07102
                                                                    Telephone: 973-776-1901
                                                                    Paul.Fishman@arnoldporter.com
                                                                    Lee.Cortes@arnoldporter.com

                                                  *Counsel for Congresswoman LaMonica McIver*